[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 18, 2002
THOMAS K. KAHN
CLERK

_____

No. 02-11437
_____

(D.C. Docket No. 99-00145-CV-DF-3)

H. L. NIX, ARLENE NIX,
Individually and as administrators of the
Estate of H. L. Jeremiah Nix, Jr., Deceased,

Plaintiffs-Appellants,

versus

FRANKLIN COUNTY SCHOOL DISTRICT, PAUL E. BROWN,
Individually and in his capacity as a Teacher for Franklin County High School;
JACK SLATON, Individually and in his capacity as the Principal
of Franklin County High School; and THOMAS BRIDGES,
Individually and in his capacity as the Superintendent of Franklin County Schools,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(November 19, 2002)**

Before ANDERSON and CARNES, Circuit Judges, and POLLAK*, District Judge.

_____

*Honorable Louis H. Pollak, U.S. District Judge for the Eastern District of
Pennsylvania, sitting by designation.

POLLAK, District Judge:

In this civil-rights case, this court is asked to define the contours between harms best left to the province of traditional tort law and those harms that rise to the level of constitutional violations. Appellants H.L. and Arlene Nix, pursuant to 42 U.S.C. § 1983, brought a civil-rights action against the appellees seeking damages for the death of the Nixes' son, Jeremiah. Finding that the Nixes failed to show that the appellees' conduct violated a right secured by federal law, the District Court granted the appellees' motion for summary judgment as to all of the Nixes' claims. The Nixes brought this appeal. We will affirm the District Court's holding.

## I.  Factual Background

This case arises from the tragic death of Jeremiah Nix during a classroom demonstration at Franklin County High School. In the fall of 1997, Jeremiah, a 17-year-old student, was enrolled in an electromechanical class taught by defendant Paul Brown. Brown had been teaching the electromechanical curriculum at Franklin County High School for twenty-three years. As a regular part of the class, Brown instructed his class of approximately twenty-five students about the basics of electricity. The curriculum called for students to use volt meters to measure voltages in an electrical current.

2

On November 3, 1997, Brown was instructing the class on the use of a volt meter. In order to give his students the opportunity to operate a volt meter themselves, Brown had arranged a single insulated wire across the students' desks. At various points along the length of the wire, the insulation had been cut away and the wire exposed so that the students could place the probes from their voltage meters onto exposed wire. The wire was then connected to an adjustable transformer, which Brown controlled. After checking to ensure that the probes were all properly attached to the exposed areas of the wire, Brown turned on the transformer and began to increase the voltage in graduated increments, with a peak voltage of 700 volts. Brown chose to bring the current to 700 volts so that the students might measure voltages spanning the full range of values permitted by the meters, which were capable of reading up to 750 volts. Brown repeatedly warned the students about the risk of touching the exposed wires.

While the voltage-reading demonstration was taking place, Jeremiah Nix was seated at a table with two other students. Brown sat across the table from the three students. Jeremiah and the other students asked Brown several questions about the possible effects that would result if they touched the wire. Brown explained to them that if they touched the wire with both hands, the electricity would flow across the heart and possibly cause death. Accordingly, Brown told

3

the students not to touch the wire.

While the transformer was operating at the 700-volt level, Brown turned to answer a question posed by one of the students seated to his left. When he turned back to the table in front of him, he noticed that Jeremiah was leaning over to his left with the wire in his hands. Brown immediately cut off the power to the transformer and sought to assist Jeremiah, who was gasping for breath. Brown raised Jeremiah's arms in an attempt to help him breathe. Some of the other students ran across the hall for assistance, and another teacher came into the classroom and helped Brown perform CPR on Jeremiah. Emergency medical technicians were called to the school, but the efforts to revive Jeremiah were unsuccessful — he died from the electrical shock.

The Nixes have presented some evidence that Brown was aware of substantial risks to the students in his class. Arlene Nix, Jeremiah's mother, has given deposition testimony that the electrical equipment in the classroom "kept blowing fuses and it kept showing it was off and on." In addition, Brown was aware that students often touched the electrical probes and that some students were being shocked. He knew that students in a group as large as his class would inevitably touch live wires, that students would occasionally "get their hands in the wrong place at the wrong time," and that some students were intentionally

4

shocking themselves or one another. Others in the school were also alerted to possible problems: a few days prior to Jeremiah's electrocution, the mother of one of Brown's students called the high school because she had learned from her son that students were being shocked in the class. She expressed concern for the safety of the pupils in the course, and was assured that there was no need for concern and that she would be contacted by either the Principal or his assistant. The promised response from the school never came.

Assistant Principal Stanley Whitsitt testified that, from a safety standpoint, the curriculum has not been changed since 1974. Whitsitt testified as to his belief that the Principal and Vice Principal were aware that live electricity was being used in Brown's classroom. Brown testified that his experimental methodology had become a "custom" after so many years of being used in the class, and that his superiors were aware of that custom. However, Principal Jack Slaton denied any knowledge that 700 volts of electricity were being used.

## II.   Procedural History

H.L. and Arlene Nix, Jeremiah's parents, filed a § 1983 complaint on October 23, 1999. They named as defendants: the school district; Brown; Principal Slaton; and Thomas Bridges, Superintendent of the Franklin County School District.   In their complaint, the Nixes alleged that the defendants' actions

5

deprived Jeremiah of his due-process rights under the Fourteenth Amendment by placing him at an unreasonable risk of harm.

After discovery, all defendants moved for summary judgment, based on qualified immunity and the more general defense that no constitutional violation occurred. The District Court granted summary judgment for all defendants on all claims.

## III.   General Due Process Principles

The crucial inquiry for this court is whether the alleged facts, if true, would amount to a constitutional violation. As a general rule, to prevail on a claim of a substantive due-process violation, a plaintiff must prove that a defendant's conduct "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 836, 846-47 (1998).

A. Conduct that is "conscience-shocking"

The somewhat nebulous "shocks the conscience" phrase has taken on different meanings in different cases, depending on a given case's factual setting. For many contexts, the Supreme Court has yet to determine how serious misconduct must be to be characterized as "conscience shocking" (a standard which "duplicates no traditional category of common-law fault," *id.* at 848), but the Court has made clear that a showing of mere negligence is insufficient to make

out a constitutional due-process claim: "[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Id.* at 849; *see also Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986); *Daniels v. Williams*, 474 U.S. 327, 330-32 (1986). The Court has, however, pointed out that actions "intended to injure in some way unjustifiable by any government interest" are those "most likely to rise to the conscience-shocking level." *Sacramento*, 523 U.S. at 849. Acts that fall between the poles of negligence and malign intent require courts to make "closer calls," *id.* at 849, in which the determination of what shocks the conscience is context-specific. "Deliberate indifference that shocks in one environment may not be so patently egregious in another . . . ." *Id.* at 850.

## B. Avoiding the encroachment of substantive due process into the tort field

Before proceeding to analysis of the Nixes' due-process claim, we must pause to consider the pronouncements of the Supreme Court regarding the boundaries separating tortious injuries from constitutional harms. "As a general matter, the [Supreme] Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this [uncharted] area are scarce and open-ended." *Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 125 (1992). When shaping the contours of due-process law, the Court has often emphasized the need to prevent the Fourteenth Amendment

7

from becoming a surrogate for conventional tort principles. Confining liability to more culpable actors, as suggested in *Sacramento*, is in accordance with the intent of the Due Process Clause: "'to secure the individual from the arbitrary exercise of the powers of government.'" *See Daniels*, 474 U.S. at 331 (quoting *Hurtado v. California*, 110 U.S. 516, 527 (1884)). In *Daniels*, the Court found that an inmate plaintiff's slip-and-fall incident at a jail was "quite remote" from the concerns of the Due Process Clause. *Id.* at 332. The Court went on to say:

> Far from an abuse of power, lack of due care suggests no more than a failure to measure up to the conduct of a reasonable person. To hold that injury caused by such conduct is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law.
>
> . . . Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society. We have previously rejected reasoning that "'would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may

8

already be administered by the States.'" *Paul v. Davis*, 424 U.S. 693, 701 (1976), quoted in *Parratt v. Taylor*, 451 U.S. [527, 544 (1981)].

*Id.*

### III. Analysis of the Nixes' Claims

Mindful of the Supreme Court's expressed reluctance to expand the due-process jurisprudence into areas of conventional tort law, we must determine, in the context of this case, what level of culpability would be needed to give rise to a constitutional claim. In their complaint, the Nixes alleged that the actions of the defendants "were particularly arbitrary, reckless, and deliberately indifferent." Therefore, the claims fall in the middle range of the culpability spectrum and call for the court to decide if the due-process umbrella spreads wide enough to shelter claims of recklessness and/or deliberate indifference in the high-school setting in which Jeremiah's death occurred.[1] We will assume *arguendo* that the actions of the defendants were, as the Nixes assert, deliberately indifferent to Jeremiah's safety. That assumption made, the threshold matter of whether that deliberate

---

[1] For purposes of this discussion, we will equate claims of recklessness and claims of deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 836 (1994) ("It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.").

indifference would constitute a due-process violation remains to be decided.  We

are aware of no case law directly on point, and so will proceed by evaluating the

most analogous cases and concepts, which will serve as the landmarks with which

to triangulate the correct placement of this case on the existing landscape of

substantive due-process decisions.

A. Cases involving claims of government employees arising out of unsafe working
conditions

In keeping with the general policy of avoiding overlap between due-process

and ordinary tort claims, courts have held, in fact situations somewhat similar to

the current one, that no due-process liability attaches.  For instance, the Supreme

Court, when faced with a claim against a city by the widow of a city employee who

was asphyxiated after entering a manhole to unstop a sewer line, stated:

> We . . . are not persuaded that the city's alleged failure to train
> its employees, or to warn them about known risks of harm, was an
> omission that can properly be characterized as arbitrary, or conscience
> shocking, in a constitutional sense.  Petitioner's claim is analogous to
> a fairly typical state-law tort claim: The city breached its duty of care
> to her husband by failing to provide a safe work environment. . . .
> [W]e have previously rejected claims that the Due Process Clause
> should be interpreted to impose federal duties that are analogous to
> those traditionally imposed by state tort law.

*Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 128 (1992) (citations

omitted).  The Due Process Clause "does [not] guarantee municipal employees a

workplace that is free of unreasonable risks of harm."  *Id.* at 129.

10

This court has been explicit in stating that "deliberate indifference" is insufficient to constitute a due-process violation in a non-custodial setting: "While deliberate indifference to the safety of government employees in the workplace may constitute a tort under state law, it does not rise to the level of a substantive due process violation under the federal Constitution." *White v. Lemacks*, 183 F.3d 1253, 1259 (11th Cir. 1999) (no § 1983 liability where nurse, while working in jail infirmary, was beaten by inmates).

Both *Collins* and *White* reflect judicial reluctance to second-guess policy decisions about resources to be allocated to safety, which are best left to "locally elected representatives, rather than . . . federal judges interpreting the basic charter of Government for the entire country." *Collins*, 503 U.S. at 128-29; *see also White*, 183 F.3d at 1258 (quoting *Collins* and further noting that "when someone not in custody is harmed because too few resources were devoted to their safety and protection, that harm will seldom, if ever, be cognizable under the Due Process Clause").

Like the government workers injured in *Collins* and *White*, Jeremiah Nix was "not in custody." This court has ruled that schoolchildren are not in a custodial relationship with the state. *See Wyke v. Polk County Sch. Bd.*, 129 F.3d 560, 569 (11th Cir. 1997). In *Wyke*, the mother of a junior-high-school student

who committed suicide at home sued school officials under § 1983.  The plaintiff alleged that by failing to act after her son had twice attempted suicide at school, the school officials had shown deliberate indifference to the student's rights.  This court held that school attendance laws did not restrain personal liberty in a way that placed an affirmative duty on the school to provide for the student's "'safety and general well-being.'"  *Id.* (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)).

B. Cases in school settings

The *Collins* and *White* cases, while instructive, do not address due-process claims by a student against school personnel.  There are, however, two decisions of this court that, together, show that even intentional acts directed toward students will not necessarily give rise to a constitutional claim.

In *Dacosta v. Nwachukwa*, 304 F.3d 1045 (11th Cir. 2002) (*per curiam*), a student sued her college instructor for battery.  This court refused to permit the intentional tort of battery to swell to constitutional proportions: "In the instant case, Dacosta . . . cannot point to any authority holding that a battery perpetrated by a college teacher upon an adult student rose to the level of a substantive due process violation."  *Id.* at 1049.  *Dacosta*, then, shows that even an act at the upper end of the culpability spectrum — an intentional act — will not necessarily support a due-

12

process claim.

Only in the limited context of due-process claims based on excessive corporal punishment has this court held that the intentional conduct of a high-school educator may shock the conscience. In *Neal v. Fulton County Board of Education*, 229 F.3d 1069, 1076 (11th Cir. 2000), we held that a plaintiff had sufficiently alleged a due-process claim where a coach had struck a student with a "weight lock" and knocked the student's eye out of socket. In his attempt to punish the student's behavior, the coach employed an obviously excessive amount of force that "truly reflect[ed] the kind of egregious official abuse of force that would violate substantive due process protections." *Id.* Importantly, the *Neal* opinion makes clear that considerations unique to claims of excessive corporal punishment — claims not present in *Dacosta* or the case at bar — shaped the outcome. *See id.* (referring specifically to the student's "right under the Fourteenth Amendment to be free from excessive corporal punishment").

C. The Nixes' case

From the cases just discussed, two principles emerge: (1) generally, those individuals not in state custody will have no due-process claim for unsafe conditions; and (2) specifically, in a classroom setting, courts have not allowed due-process liability for deliberate indifference, and, moreover, will only allow

recovery for intentional conduct under limited circumstances.  Examining the

Nixes' case in light of those concepts, we conclude that allegations of "deliberate

indifference" do not, in this fact situation, "shock the conscience" in a way that

gives rise to a due-process violation.  The holding of the *Dacosta* case supports this

outcome: if a teacher's intentional tort (as in *Dacosta*) does not "shock the

conscience," the deliberate indifference attributed, in the case at bar, to Brown

cannot survive summary judgment.[2]  To extend the protections of the Fourteenth

Amendment to the Nixes would balloon this circuit's due-process jurisprudence

well beyond its current confines.

Today's holding also comports with the Supreme Court's mandate to remain

vigilant in policing the boundaries separating tort law from constitutional law.

Substantive due process is a doctrine that has been kept under tight reins, reserved

for extraordinary circumstances.  The Nixes' claims do not present such

---

[2]To be sure, *Dacosta* differed in some ways from this case: the former case involved an older student in a collegiate setting, who was presumably not subject to compulsory attendance rules.  However, this court finds that the two cases are similar enough to necessitate the same result.  Still, it is important to note that today's holding is a narrow one; it would not necessarily control, say, a similar accident in a 4th-grade classroom, or even other types of seriously harmful behavior occurring in a high-school class.

circumstances and are properly confined to the realm of torts.[3]  The conditions in

the electromechanical course, while truly unfortunate, do not rise to the level of an

affront of constitutional dimension.

AFFIRMED.

---

[3]The District Court arrived at the same conclusion and relied heavily upon the Supreme Court's decision in *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989), which stated that "[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  In weighing the Nixes' argument that *DeShaney* "does indeed 'leave room' for state liability where the state creates a danger or renders an individual more vulnerable to it," *Wyke v. Polk County Sch. Bd.*, 129 F.3d 560, 567 (11th Cir. 1997), the District Court held that the electrical experiment was not the type of state-created danger contemplated by the *Wyke* court.

Because we hold that the Nixes' allegations fail to satisfy the most basic requirements of a valid due-process claim, we express no opinion on the applicability of *DeShaney* to the facts of this case.