[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14536
_____

D.C. Docket No. 5:16-cv-00658-TJC-PRL

JOLENE WALDRON,
as the Personal Representative of the
Estate of Anthony R. Ybarra, Jr. a minor,

Plaintiff–Appellee,

versus

GREGORY SPICHER,
Deputy, individually,

Defendant–Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(March 25, 2020)

Before ANDERSON, MARCUS, and EBEL,[*] Circuit Judges.

ANDERSON, Circuit Judge:

Jolene Waldron, the personal representative of her son, the late Anthony Ybarra, Jr., filed the instant case against Gregory Spicher, a Sheriff's Deputy with the Marion County, Florida, Sheriff's Office.  After her son attempted to commit suicide by hanging himself, Waldron contends that Spicher, the responding officer on the scene, stopped several bystanders from performing CPR on Ybarra, in violation of his substantive due process rights under the Fourteenth Amendment. Spicher moved for summary judgment on the grounds that he was entitled to qualified immunity, which the district court denied.  Spicher appeals from this determination.  We hold that the district court applied an erroneous legal standard. We announce the correct legal standard, and remand to the district court to apply that standard in the first instance.  Accordingly, we vacate the judgment of the district court, and remand for further proceedings not inconsistent with this opinion.

## I. BACKGROUND

While the parties largely agree on the underlying facts, we nonetheless set them out in some detail because they are relevant to our ultimate decision.  Taking

---

[*] Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

the facts in the light most favorable to the plaintiff in this summary judgment qualified immunity posture, we assume the following circumstances.

### A.    Ybarra's Suicide and the Immediate Response

On November 14, 2014, Anthony Ybarra, Jr., attempted to commit suicide by hanging himself from a tree outside his house with belts and ropes.  Though it is unclear how long Ybarra was hanging before he was discovered, it is likely that at least several minutes elapsed before he was ultimately discovered by Waldron and her other children.  When Waldron discovered her son, she began screaming and attempted to bring him down.  One of her neighbors, Ronald Timson, a former emergency medical technician ("EMT"), heard her screams and rushed over to help.  Waldron and Timson had difficulty cutting the ropes and belts that Ybarra had hung himself with, but were eventually able to do so.  Timson examined Ybarra and detected a "faint, faint pulse" on Ybarra's carotid artery and felt that Ybarra "was not cold."  Because of Ybarra's "nonwhite" skin, Timson was unable to tell if Ybarra was cyanotic[1] and saw some faint bruising around his neck.  He immediately began performing CPR on Ybarra.  As Timson did so, Waldron testified that she saw Ybarra exhale, but Timson did not.

---

[1] Cyanosis is a "bluish discoloration, applied especially to such discoloration of the skin and mucous membranes due to excessive concentration of reduced hemoglobin in the blood."  *See Cyanosis*, Dorland's Illustrated Medical Dictionary (28th ed. 1994).  In layman's terms, the district court explained that cyanosis "refers to the blue color a person becomes when their tissue is not receiving sufficient levels of oxygen."

While Timson was performing CPR, Waldron and Christina Timson, Ronald's wife, repeatedly attempted to call 911 to report the emergency, but the line kept disconnecting. Christina Timson was able to call 911 successfully at 4:00 PM, shortly after Ybarra was discovered, and a rescue unit was dispatched at approximately 4:02 PM. Meanwhile, Waldron called her boyfriend's mother, Karen VanEs, a nurse, at approximately 4:04 PM, who arrived at the Waldron residence several minutes later.

At the time that VanEs had arrived, Timson had been performing CPR for several minutes. When she arrived, VanEs joined him. She noted that Ybarra's color was not "dusky" or "kind of grayish," which would have indicated to her that he was "dead or close to death." She did not observe any breathing or any other signs that indicated he was alive. She performed CPR for a short period of time—accounts vary as to whether it was a minute or several minutes—before Sheriff's Deputy Gregory Spicher arrived.

Upon his arrival, Spicher directed both VanEs and Timson to stop performing CPR. When no one acceded to his request, he ordered them to stop again. Timson stepped away and VanEs stopped, but she checked Ybarra's left radial artery and felt a "weak beat." She protested to Spicher that "there was a heartbeat," to which he replied, "Well, that's because you're performing CPR." At that point, she removed her hands and said, "But I'm not doing CPR." She then stood up and

4

walked away.  Spicher subsequently called in a "Signal 7," which meant that "there is a deceased individual at the scene" and that emergency units need not "rush" to the scene.[2]  In his deposition, Spicher testified that before he called in the Signal 7, he checked Ybarra for signs of life, but the district court, based on the other witnesses' testimony, said that "[n]o one saw Spicher check Anthony for signs of life."  Thus, assuming all reasonable inferences in favor of the non-movant, we assume that Spicher did not check Ybarra for signs of life.

Several minutes later, a fire truck and an ambulance arrived.  Three paramedics—later identified as David Warren, Christensen, and Grisales—attempted to attend to Ybarra, but Spicher only allowed Warren to do so to "confirm the patient's status."  Warren testified that Spicher told him to "not touch the patient very much because this was . . . a crime scene."  Warren noted that Ybarra was "severely cyanotic and unresponsive" and his neck was elongated.  He assessed Ybarra with a Glasgow Coma Score of one in eyes, verbal, and motor, which was consistent with a deceased person's score.  Warren hooked up Ybarra to a heart monitor and noted a heart rate of 24 beats per minute, which he testified indicated organized electrical activity in the heart inconsistent with death.  Warren called for Spicher to retrieve Lieutenant Christensen, but Spicher was on the phone and did not

---

[2] The emergency services incident report indicates that Spicher called in the Signal 7 at approximately 4:08 PM, and was notated as "SLOW ALL UNITS TO COLD S7."

5

hear him, so Warren shouted louder, which finally brought Christiansen over. The two immediately recontinued CPR and began "manual C-spine immobilization," which was meant to hold Ybarra's spine in line. Ybarra was then transported to the hospital, where he died a week later.

B.    Internal Affairs Investigation

Shortly after the events of November 14, 2014, the Marion County Sheriff's Office's Internal Investigations Unit opened an investigation into Spicher's conduct. The Unit interviewed all of the witnesses—that is, Waldron, her children, the Timsons, VanEs, Warren, and Spicher. The Unit reached the following conclusion:

> Deputy Spicher was acting in the role of a law enforcement officer at the time of this incident; he had been trained to administer CPR. His years of advanced medical training and experience should have been a benefit in this instance. CPR training will teach you that you don't cease CPR once it begins, unless the person administering it is relieved by medical personnel or becomes exhausted. Deputy Spicher made, what he believed at the time, a correct decision when giving the order; however, he lacked the facts to do so. Deputy Spicher did not know that the civilians administering CPR had medical backgrounds or how long the subject had been hanging before he was cut down. Once someone is deceased you can, during a time frame, possibly bring them back to life.
>
> Deputy Gregory Spicher's actions at the time of his arrival, in as far as his commands to civilians, were not proper as to his role of a law enforcement officer and the Marion County Sheriff's Office. Therefore, Violation of operations Directive 1068.04(A) Dereliction of Duty is **SUBSTANTIATED.**

(emphasis in original).

6

C.    Procedural History

Waldron filed suit against Spicher, alleging that he violated Ybarra's Fourteenth Amendment substantive due process rights. Each party introduced expert testimony as to the proximate causation of Ybarra's death. Waldron's expert, Dr. Mazyar Rouhani, stated that Ybarra "would have survived the hanging and may have been neurologically intact if he would have continued to receive continuous CPR by [the] bystander[s] and [emergency medical services]," but Spicher's expert, Dr. Kris Sperry, stated that Ybarra had deteriorated to such a point that no amount of CPR or medical care would have been able to save him.

Both parties filed motions to exclude the other's expert witnesses, and Spicher moved for summary judgment based on qualified and sovereign immunity and on Waldron's demand for punitive damages. The District Court denied the motions to exclude Rouhani and Sperry as expert witnesses, denied Spicher's motion as to punitive damages, and denied his motion as to qualified and sovereign immunity. Spicher appealed the District Court's denial of his motion for summary judgment *solely* on the issue of qualified immunity.

## II. ISSUE

The ultimate issue on appeal is whether the district court erred in denying Spicher's motion for summary judgment. However, there are several subsidiary issues, including:

7

(1)    Whether Spicher was acting within his discretionary authority; and

(2)    Whether the district court employed the correct legal analysis, and if not, what Waldron must prove to demonstrate a violation of clearly established substantive due process rights.

We decline to address the first issue; we prefer that the district court address it in the first instance.  This opinion addresses only the second issue.

### III. ANALYSIS

"Qualified immunity protects government officials from liability for civil damages unless they violate a statutory or constitutional right that was clearly established at the time the alleged violation took place."  *Gilmore v. Hodges*, 738 F.3d 266, 272 (11th Cir. 2013) (citation omitted).  Because qualified immunity is available only if the official is "carry[ing] out their discretionary duties," *see id.* (quotation omitted), our inquiry begins by considering whether the official was acting within the scope of his discretionary authority.  *See Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004).  "If, interpreting the evidence in the light most favorable to the plaintiff, the court concludes that the defendant was engaged in a discretionary function, then the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity."  *Id.* (citing *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003)) (emphasis in original).  Then, the plaintiff must demonstrate that his constitutional rights were violated and that the right at issue was "'clearly established' at the time of defendant's alleged misconduct."  *Pearson v.*

8

*Callahan*, 555 U.S. 223, 232 (2009). We review all of these determinations *de novo*, *Nolin v. Isbell*, 207 F.3d 1253, 1255 (11th Cir. 2000), and "view all evidence and make any reasonable inferences that might be drawn therefrom in the light most favorable to the non-moving party," but "only to the extent supportable by the record," *Loftus v. Clark-Moore*, 690 F.3d 1200, 1203 (11th Cir. 2012) (quotation omitted). We begin by considering whether Spicher was acting within his discretionary authority, and then proceed to the core qualified immunity analysis.

A.    Discretionary Authority

In most cases, plaintiffs concede that the defendant was acting within his discretionary authority at the time of the alleged constitutional violation. In the proceedings before the district court, Waldron did not argue that Spicher was not acting within his discretionary authority and the district court assumed that she had conceded the point. Perhaps inspired by the district court's suggestion that "the Court is not so sure" that "Spicher was acting within the scope of his discretionary authority," Waldron argues for the first time before us that Spicher was *not* acting within his discretionary authority.

Generally, "[a]rguments raised for the first time on appeal are not properly before this Court." *Hurley v. Moore*, 233 F.3d 1295, 1297 (11th Cir. 2000). But our "power to entertain an argument raised for the first time on appeal is not a jurisdictional one; thus we *may* choose to hear the argument under special

9

circumstances." *Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1332 (11th Cir. 2004) (citing *Dean Witter Reynolds, Inc. v. Fernandez*, 741 F.2d 355, 360 (11th Cir. 1984)) (emphasis in original).

We note that the district court declined to address the discretionary authority issue, because neither party raised the issue and because, under the district court's analysis, it would not have changed the outcome. We decline to address this issue; we prefer that the district court address in the first instance both whether Waldron's actions in the district court constitute a waiver, and the merits of the issue. Accordingly, the balance of this opinion assumes *arguendo*—but does not decide— that Spicher was acting within his discretionary authority.

## B.    Core Qualified Immunity Analysis

As we explained previously, the core qualified immunity analysis consists of two questions: (1) whether the official violated the plaintiff's constitutional rights, and (2) if so, whether those rights were clearly established. We "may undertake these two inquiries in either order." *Maddox v. Stevens*, 727 F.3d 1109, 1120 (11th Cir. 2013) (citing *Pearson*, 555 U.S. at 236). Because we are assuming that Spicher was acting within the scope of his authority, to prevail, Waldron will have to prove not only that her substantive due process rights were violated (the first prong), but also that the substantive due process rights thus violated were clearly established (the second prong) at the time Spicher acted. Because Waldron can prevail only if

10

she successfully establishes this second prong, and because if she does establish the second prong she necessarily will have established the first prong, we address in this opinion *only* whether Waldron can prove that Spicher's actions violated clearly established substantive due process rights.

This court has identified three different ways that a plaintiff can prove that a particular constitutional right is clearly established. First, a plaintiff can show that a materially similar case has already been decided. *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). This category consists of binding precedent tied to particularized facts in a materially similar case. In determining whether a right is clearly established under this prong, only materially similar cases from the United States Supreme Court, this Circuit, and/or the highest court of the relevant state can clearly establish the law. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199, 1199 n.6 (11th Cir. 2007). Second, a plaintiff can also show that a broader, clearly established principle should control the novel facts of a particular case. *Mercado*, 407 F.3d at 1159. "[T]he principle must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Loftus*, 690 F.3d at 1205 (alteration in original). Put another way, "in the light of pre-existing law, the unlawfulness must be apparent." *Id.* Third, a plaintiff could show that the case "fits within the exception of conduct which so obviously

11

violates [the] Constitution that prior case law is unnecessary." *Mercado*, 407 F.3d at 1159. This third test is a narrow category encompassing those situations where "the official's conduct lies so very obviously at the very core of what the [relevant constitutional provision] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding lack of case law." *Loftus*, 690 F.3d at 1205 (alteration in original) (quoting *Terrell v. Smith*, 668 F.3d 1244, 1257 (11th Cir. 2012)).

### 1.    Significance of *Hamilton* and *Lewis* for this case

We begin our analysis with a discussion of the very similar case of *Hamilton by and through Hamilton v. Cannon*, 80 F.3d 1525 (11th Cir. 1996). There, Hamilton, the plaintiff's daughter, was thrown into a swimming pool but did not know how to swim and ultimately died. *Id.* at 1527. The lifeguard on duty "had received no formal lifeguard training nor any instruction with respect to drownings or any other potential emergencies at the pool." *Id.* at 1527–28. All he "knew to do was to remove [Hamilton] from the pool and place her on the edge of it." *Id.* at 1528. Following his removal of Hamilton from the pool, a bystander trained in CPR began administering CPR in an attempt to revive Hamilton. *Id.* "After [the bystander] initiated CPR, Hamilton appeared to begin shallow breathing and to revive slightly." *Id.* Some testimony indicated that "Hamilton held her head up, began to cough and moved her arm," and the bystander "felt a pulse and saw

12

Hamilton trying to respond by moving her eyes." *Id.* At this point, a sheriff's deputy arrived at the scene and "ordered everyone to clear the area around Hamilton," including the bystander administering CPR. Despite the bystander's objections, the officer specifically ordered her away from Hamilton. *Id.* The deputy "then examined Hamilton's condition, but did not himself undertake CPR efforts or take any other medical action on her behalf, apparently believing that Macon County's emergency medical technicians would arrive immediately after him." *Id.* However, because the EMTs were confused about the location, their arrival was delayed by several minutes, during which time "no one provided medical attention to Hamilton." *Id.* The bystander ran to her nearby home to retrieve her CPR certification card and returned; and during that five minutes, again, no one provided any medical care to Hamilton. *Id.* The bystander was allowed to resume CPR and the EMTs arrived shortly thereafter, but "Hamilton had already passed the point at which medical assistance could be of benefit," and she was declared dead shortly thereafter. *Id.* The district court denied the deputy's invocation of qualified immunity, and we reversed. We concluded that the cases Hamilton relied on to clearly establish a substantive due process violation were either dicta, or insufficiently similar such that the law had not been "developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he [was] doing violates federal law." *Id.* at 1531

13

(internal quotations omitted). We held: "It would take much creativity and imagination to glean from the factually distinguishable cases upon which the plaintiffs rely a clearly established rule of law that an unsuccessful, negligent, or reckless rescue attempt, or interference with a bystander's rescue attempt, amounts to a constitutional violation." *Id.* at 1532.

In *Hamilton*, we applied the then-prevailing substantive due process analysis which provided that, ordinarily, government officials "are under no duty to provide rescue." *Id.* at 1529. This general substantive due process law was subject to two exceptions in our Circuit: (1) the "special relationship" doctrine, and (2) the "special danger" doctrine. With respect to the first, we explained in *Bradbury v. Pinellas County*, 789 F.2d 1513, 1516 n.2 (11th Cir. 1986), "there are times when the Constitution requires local governmental units to provide basic protective services to individuals with whom the government has created a special relationship," usually through arrest or other forms of custody. And as to the second, "a plaintiff may show a duty on the state's part . . . by establishing that the plaintiff, as opposed to the general public, faced a special danger." *Cornelius v. Highland Lake*, 880 F.2d 348, 354 (11th Cir. 1989), *abrogated as recognized in White v. Lemacks*, 183 F.3d 1253, 1257–58 (11th Cir. 1999) We subsequently explained that the substantive due process analysis which the *Hamilton* opinion employed was "superseded by the standard employed by the Supreme Court in *Collins* [*v. City of Harker Heights*]."

14

*White*, 183 F.3d at 1257–59.  "Thus, the conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense." *Waddell v. Hemerson*, 329 F.3d 1300, 1304 (11th Cir. 2003) (citing *Collins*, 503 U.S. 115, 128 (1992); *White*, 183 F.3d at 1257–59).

The Supreme Court in *County of Sacramento v. Lewis* described the concept of conscience shocking in the constitutional sense.  523 U.S. 833 (1998).  With respect to executive action, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* at 846 (internal quotation omitted).  The "Due Process Clause was intended to prevent government officials from abusing [their] power, or employing it as an instrument of oppression."  *Id.* (internal quotations omitted) (alteration in original).  *Lewis* noted that "the measure of what is conscience shocking is no calibrated yard stick[.]"  *Id.* at 847.  Context and the circumstances are significant, and the level of culpability required can vary with the context. *Id.* at 849–54.  Thus, *Lewis* noted that the Court had held that "deliberately indifferent conduct . . . [is] enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial[.]" *Id.* at 850.  But, the Court noted:  "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of

15

circumstances before any abuse of power is condemned as conscience-shocking." *Id.* at 850. The Court contrasted the context of a pretrial detainee in need of medical care to that of a prison riot or the high-speed chase at issue in *Lewis*. *Id.* at 849–53. In the pretrial detainee context, "actual deliberation is practical," and there are no "substantial countervailing interest[s] excus[ing] the State from making provision for the decent care and protection of those it locks up." *Id.* at 851. However, in the context of a prison riot or high-speed chase, the police face "an occasion calling for fast action[,] have obligations that tend to tug against each other," and are "often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 853 (quotation omitted). "[W]hen unseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates" substantive due process. *Id.* Thus, in the context of the high-speed chase at issue in *Lewis*, the Court held that a "purpose to cause harm" was required. *Id.* at 854. Accordingly, the Court held: "[W]e hold that high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment." *Id.*

As is apparent from the above discussion of *Lewis*, context is significant. And the above description of the facts in *Hamilton* reveals that the facts of the instant case are very similar. The general context is identical: both cases involve a law

16

enforcement officer called to the scene of an attempted suicide (in the instant case) or an accidental drowning (in *Hamilton*). In both cases, bystanders were performing lifesaving CPR when the officer arrived. In both cases, the officer ordered everyone away from the victim, thus terminating ongoing CPR efforts. In both cases, the bystanders objected, but the officer persisted in his order such that CPR terminated. In neither case did the officer himself undertake CPR efforts. In both cases, no CPR or other lifesaving efforts were undertaken (for a few minutes until paramedics arrived in our case and for five minutes in *Hamilton*, 80 F.3d at 1528). In both cases, the victim died.

As explained in *Lewis*, the context in which the officer's action occurs is important in determining the level of culpability required for a plaintiff to state a viable substantive due process violation. Our *Hamilton* decision holds that, in the context there, a "reckless rescue attempt, or interference with a bystander's rescue attempt," 80 F.3d at 1532, does not rise to the level of a clearly established violation of substantive due process. Deputy Spicher in our case argues that the context in this case is materially similar to that in *Hamilton*, and therefore the plaintiff in our case must prove more than reckless interference with the bystanders' rescue attempt to demonstrate a clearly established violation of the Constitution.

Waldron responds—and the district court apparently agreed—that *Hamilton* analyzed the substantive due process challenge there employing the now-superseded

17

"special relationship" or "special danger" analysis, and therefore that *Hamilton* could provide little or no guidance to Spicher as to what the Constitution required—*i.e.*, little or no indication of the content of a clearly established violation of substantive due process.  Contrary to Waldron's position, we believe that our decision in *Hamilton* is a relevant part of the "legal landscape" that would have informed Spicher with respect to the contours of the constitutional right.  Binding case law in this Circuit holds that the "relevant legal landscape"—including even cases from outside our Circuit and unpublished cases—are informative in a court's determination of whether a particular constitutional right is clearly established. *Corbitt v. Vickers*, 929 F.3d 1304, 1319 n.14 (11th Cir. 2019); *Denno v. Sch. Bd. of Volusia Cty., Fla.*, 218 F.3d 1267, 1272–75 (11th Cir. 2000) (identifying the relevant legal landscape as including out-of-circuit and district court decisions and declining to "hold government officials to a higher level of knowledge and understanding of the legal landscape than the knowledge and understanding by judges").  Thus, merely because a later Supreme Court case changed the legal analysis, we cannot expect every reasonable officer in Spicher's shoes to disregard the fact that the materially similar facts in *Hamilton* resulted in a holding that it takes more than a "reckless . . . interference with a bystander's rescue attempt" to constitute a clearly established violation of substantive due process.

18

Moreover, even if Spicher had been aware that the Supreme Court changed the appropriate analysis after our *Hamilton* decision, we do not believe that would undermine the significance of *Hamilton* for this case. The new shock-the-conscience analysis is clearly at least as favorable to defendant governmental officers—and unfavorable to plaintiffs in suits like Waldron's—as had been the previous analysis; and very probably the new standard is more so. Thus, there being fair notice to reasonable officers in Spicher's shoes under the old standard that it takes more than reckless interference with a rescue attempt to violate clearly established substantive due process rights, we believe that there is at least as much fair notice to Spicher under the new standard.

For the foregoing reasons, we believe that in this Circuit, Spicher's actions cannot be deemed to violate clearly established substantive due process rights, unless the jury finds that Spicher acted with a level of culpability more than reckless interference with bystanders' attempted rescue efforts. This leads us to disagree with the rationale of the district court, which based its qualified immunity holding on deliberate indifference as the foundation level of culpability. The district court recognized that "something more" was required. The "something more" on which the district court relied was the following: the gravity of Ybarra's medical need (it was clear he would die without continued CPR); the fact that Spicher required cessation of CPR without assessment of Ybarra's condition and without any

19

competing emergency or law enforcement needs; the fact that it was obvious to any law enforcement officer in that situation that ongoing CPR should not be terminated unless relieved by medical personnel or required by exhaustion; the fact that Spicher had second chances when Mrs. VanEs protested that she felt a pulse; and the egregiousness of the circumstances.  Our problem with the district court's rationale is that the tragic circumstances that the district court assumed—and that we must assume in this summary judgment posture—are materially similar to those in *Hamilton*.

In other words, the "something more" that the district court here relied on is materially similar to the circumstances in *Hamilton*, which this court held were insufficient to rise to the level of a clearly established substantive due process violation.  Accordingly, we conclude that in this Circuit, Spicher's actions cannot be held to violate clearly established substantive due process rights, *unless* the jury finds that Spicher acted with a level of culpability more than reckless interference with bystanders' rescue efforts.

"Deliberate indifference" and "recklessness" are frequently used together to describe similar behavior, likely because of their similar definitions.[3]  There is not

---

[3] For example, Black's Law Dictionary defines "recklessness" as "[c]onduct whereby the actor does not desire harmful consequence but nonetheless foresees the possibility and consciously takes the risk.  Recklessness involves a greater degree of fault than negligence but a lesser degree of fault than intentional wrongdoing."  It also defines "reckless" as "[c]haracterized by the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes

20

enough difference in meaning between recklessness and deliberate indifference for us to conclude that deliberate indifference would have stated a *clearly established* violation of substantive due process rights—on the facts of *Hamilton*—knowing, as we do, that recklessness did not.  Even if we were to assume, *arguendo*, that they are different standards, we cannot conclude that any difference between them has been clearly established by the Supreme Court, our Circuit, or the Florida Supreme Court.[4]  More significantly, in *Lewis*, the Supreme Court held that "deliberate

---

deliberate) disregard for or indifference to that risk."  And we have defined "deliberate indifference" as "ha[ving] three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than negligence."  *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (citing *Farmer v. Brennan*, 511 U.S. 825 (1994); *Estelle v. Gamble*, 429 U.S. 97 (1976)).

[4] In this respect, we find it significant that the argument that deliberate indifference is a significantly higher level of culpability than recklessness has been rejected by our sister circuits. *See, e.g.*, *A.H. v. St. Louis Cty.*, 891 F.3d 721, 726 (8th Cir. 2018) ("Deliberate indifference is 'akin to criminal recklessness[.]'") (citation omitted); *Kennedy v. Potter*, 344 F. App'x 987, 989 (5th Cir. 2009) ("Deliberate indifference is treated as similar to criminal recklessness.") (citation omitted); *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003) ("We have interpreted deliberate indifference . . . as being similar to subjective recklessness.") (citation omitted); *L.W. v. Grubbs*, 92 F.3d 894, 898 (9th Cir. 1996) ("[T]he Tenth Circuit recognizes that 'deliberate indifference' is the same kind of conduct is labels 'recklessness with a conscious disregard.'") (quoting *Uhlrig v. Harder*, 64 F.3d 567, 574 nn. 9–10 (10th Cir. 1995); *Hill v. Shobe*, 93 F.3d 418, 421 (7th Cir. 1996) (noting that "[c]riminal recklessness … is the same as 'deliberate indifference'") (quotation omitted); *Pavlick v. Mifflin*, 90 F.3d 205, 208–09 (7th Cir. 1996) ("[T]he Supreme Court has stated that deliberate indifference is similar to criminal recklessness[.]") (quoting *Farmer*, 511 U.S. at 839–40); *Harris v. Horney*, 1991 U.S. App. LEXIS 27193, at *7 (7th Cir. Nov. 13, 1991) (referring to "recklessness" as "the same thing" as "deliberate indifference"); *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988) (noting that the 8th Circuit "equat[ed] 'deliberate indifference' with 'reckless disregard'") (quoting *Martin v. White*, 742 F.2d 469, 474 (8th Cir. 1984); *see also Saunders v. Sullivan*, 1992 Del. LEXIS 67, at *5 (Del. Feb. 26, 1992) ("Wanton behavior . . . is similar to recklessness; it is a conscious indifference to a substantial risk.").  Moreover, "[t]he deliberate indifference standard used in certain civil rights cases," like *Farmer v. Brennan*, which involved Eighth Amendment violations, "is congruent with

21

indifference" was "equivalent to . . . reckless disregard for life," 523 U.S. at 854, which paints a legal landscape that squarely forecloses the argument that there is any significant difference between the terms.

Accordingly, because the circumstances of the instant case are materially similar to the circumstances of *Hamilton*, we cannot conclude that Spicher's reckless or deliberately indifferent interference with bystanders' rescue attempts is sufficient to constitute a violation of Waldron's clearly established substantive due process rights. In other words, with *Hamilton* as part of the relevant legal landscape guiding Spicher, we cannot conclude that he had fair notice or fair warning that reckless or deliberately indifferent actions on his part in these circumstances would violate substantive due process. *Hope v. Pelzer*, 536 U.S. 730, 739–40 (2002).

In support of our position, we note that the Supreme Court in *Lewis* held that allegations of recklessness, conscious disregard, and deliberate indifference were insufficient levels of culpability to state a substantive due process claim in the non-custodial context of a high-speed chase. 523 U.S. at 852–55. No case in the Supreme Court, or in this Circuit, or in the Florida Supreme Court has held that recklessness or deliberate indifference is a sufficient level of culpability to state a

---

the definition of recklessness" in tort law. *See* Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, The Law of Torts, Intent and Reckless or Wanton Misconduct, § 32 n.6 (2d ed. June 2019 update).

claim of violation of substantive due process rights in a non-custodial context.[5] *See Nix v. Franklin Cty. Sch. Dist.*, 311 F.3d 1373, 1377 (11th Cir. 2002) ("This court has been explicit in stating that deliberate indifference is insufficient to constitute a due-process violation in a non-custodial setting[.]") (internal quotation omitted); *see also Davis v. Carter*, 555 F.3d 979, 983 (11th Cir. 2009) ("[D]eliberate indifference is insufficient to constitute a due-process violation in a non-custodial setting.") (quoting *Nix*, 311 F.3d at 1377); *Upsher v. Grosse Pointe Sch. Sys.*, 285 F.3d 448, 453 (6th Cir. 2002) ("[T]o succeed on a § 1983 claim in a non-custodial setting, a plaintiff must prove either intentional injury or 'arbitrary conduct intentionally designed to punish someone[.]'") (quoting *Lewellen v. Metropolitan Gov't*, 34 F.3d 345, 351 (6th Cir. 1994)); *Payne v. Churchich*, 161 F.3d 1030, 1040 (7th Cir. 1998) (differentiating "deliberate indifference" as the standard "in the custodial situation of a prison" and "a much higher standard of fault than deliberate indifference" in a non-custodial situation like "in a high-speed chase") (quoting *Lewis*, 523 U.S. at 852–54).

---

[5] Our decision in *Waddell* suggested that "deliberate indifference to an extremely great risk of serious injury" *might* rise to the necessary level, notwithstanding the non-custodial context. 329 F.3d at 1306. However, the opinion merely mentioned that standard, along with others, including "for the very purpose of creating a serious injury." *Id.* at 1306 n.6. But more important, *Waddell* expressly declined to make a holding with respect to the "correct legal threshold" in a non-custodial case. *Id.* Thus, *Waddell* did not make clearly established law in that regard.

23

Having decided that—on the facts we necessarily assume—Spicher's actions, if merely reckless or deliberately indifferent, would not rise to the level of culpability necessary to state a violation of clearly established substantive due process rights, we nevertheless hold that Spicher's actions would rise to that necessary level *if* the jury should find that Spicher acted for the purpose of causing harm to Ybarra.  We derive from the Supreme Court's decision in *Lewis* the contours of actions by Spicher that clearly would rise to the level of violating clearly established substantive due process rights. We believe that it is a matter of obvious clarity, derived from principles set out in *Lewis*, that Waldron would have stated a violation of clearly established substantive due process rights *if* the jury finds that he intended to cause harm to Ybarra, which harm in the context of the facts of this case obviously would take the form of death or serious brain injury.[6]  From *Lewis*, we derive the principle that "only at the [high] end[] of the tort law spectrum of culpability" do official acts "point . . . clearly toward" the "constitutional concept of conscience shocking."  523 U.S. at 848.  In the non-custodial context of a high-speed chase by law enforcement—a context calling for "split-second judgments" and the necessity to "balance . . . the need to stop a suspect and show that flight from the law is no

---

[6] In other words, of the three methods noted above by which a plaintiff can show that a particular constitutional right is clearly established, we rely upon the second—that is, that a broader, clearly established principle should, as a matter of obvious clarity, control the novel facts of a particular case. *Mercado*, 407 F.3d at 1159.

24

way to freedom" against "the high-speed threat to all those within stopping range," *id.* at 853—the Court in *Lewis* identified that high end of the culpability spectrum as an intent to cause harm. *Id.* at 854. ("[A] purpose to cause harm . . . ought to be needed for due process liability in a pursuit case.").

If the circumstances we assume in this summary judgment posture are found by the jury, and if the jury also finds that Spicher intended to cause harm to Ybarra in the form of death or serious brain injury, then we hold that it is a matter of obvious clarity, derived from the above principles, that Waldron would have proved a violation of clearly established substantive due process rights.[7]

Little explanation is needed to show that it is a matter of obvious clarity from *Lewis*'s principles that proof of intent on the part of Spicher to cause harm to Ybarra, under the circumstances assumed here, would violate clearly established substantive

---

[7] In this case, because we address only the issue of whether Waldron can prove that her clearly established substantive due process rights were violated, we need not—and we do not—decide the precise level of culpability which is required to state a violation of substantive due process in these circumstances. We do not rule out the possibility that there might be a level of culpability higher than recklessness and deliberate indifference, but lower than an intent to cause harm, that the Supreme Court might ultimately decide is sufficient. However, there is no case from the Supreme Court, from this Circuit, or from the Supreme Court of Florida so holding. Therefore, we are confident that—in this Circuit in light of *Hamilton*, to demonstrate a *clearly established* violation —Waldron would have to prove under these circumstances that Spicher acted for the purpose of causing harm to Ybarra. *See Waddell*, 329 F.3d at 1306 n.5 (declining to decide the precise level of culpability necessary to state a viable substantive due process claim in that case, while noting several possible levels of culpability, including "for the very purpose of creating a serious injury"). There being no binding precedent fixing the precise level of culpability required in a similar non-custodial case, we conclude that the only way Waldron can prove a *clearly established* violation of substantive due process would be to prove that Spicher's actions were for the purpose of causing harm to Ybarra. This is especially so in light of the Supreme Court's decision in *Lewis*.

due process rights. With respect to the certainty and seriousness of harm, the circumstances here point more clearly to the certainty of death or serious brain injury than the circumstances in *Lewis* pointed to the certainty or seriousness of harm. With respect to substantial countervailing governmental interests, *Lewis*, 523 U.S. at 851, the two cases involved comparably weak governmental interests, but, if anything, the countervailing governmental interests here are even weaker. In *Lewis*, the Court cited the need to stop a motorcycling suspect who was speeding and who had disobeyed a uniform officer's order to stop. In our case, Spicher asserted a need to clear a crime scene, notwithstanding that the 911 call had indicated an attempted suicide was involved, and, upon Spicher's arrival, the ongoing CPR efforts did not suggest a crime scene. The district court in this case perceived no competing emergency or law enforcement concerns. Although Spicher asserts that he reasonably believed Ybarra was already dead and beyond any possible help and although that would of course be evidence of an absence of intent to harm Ybarra, that remains a question for the jury. The necessity for split-second decision-making is comparable in the two cases. With respect to the degree of egregiousness and abuse of power, we believe that the actions we assume in the instant case are more egregious than the actions of the officer in *Lewis*. Finally, the use of the power of law enforcement to disable all possible life-saving possibilities with the intent to cause harm to the victim is the epitome of the "abuse of power" and "instrument of

26

oppression" that is at the core of what substantive due process is intended to protect against. *Lewis*, 523 U.S. at 846. Accordingly, because the Court in *Lewis* concluded there that a purpose to cause harm would violate substantive due process, we believe it is a matter of obvious clarity that, if the jury finds that Spicher intended to cause harm to Ybarra in the form of death or serious brain injury, and finds the other circumstances we assume in this summary judgment posture, then we hold that Waldron would have proved a violation of clearly established substantive due process rights.

> 2. Having Rejected the District Court's Rationale, Remand is Appropriate

In this opinion, we have held that—in this Circuit where *Hamilton* is part of the relevant legal landscape—Waldron cannot demonstrate that Spicher violated clearly established substantive due process rights without proving more than that Spicher acted with deliberate indifference or recklessness. But we have also held that, if the jury should find that Spicher acted for the purpose of causing harm to Ybarra, Waldron would have proved a violation of clearly established substantive due process rights. Because the district court analyzed this case under the erroneous assumption that a deliberate indifference level of culpability was sufficient under these circumstances, the district court of course has not evaluated whether a reasonable jury could find such a purpose of causing harm on this summary judgment record, and/or whether the parties should be permitted to further develop

27

the summary judgment record in light of the standard which we announce today. We believe it is appropriate to remand this case to the district court to permit it to reconsider this case under the standard we announce in this opinion.

## IV. CONCLUSION

For the foregoing reasons, we vacate the judgment of the district court, and remand for further proceedings not inconsistent with this opinion.

**VACATED AND REMANDED.**