[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-14373

_____

D.C. Docket No. 1:12-cv-02517-ELR

TRENESHIA DUKES,

Plaintiff - Appellant,

versus

NICHOLAS DEATON,
in his individual capacity,
STEVE BRANHAM,
in his individual and supervisory capacity,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(January 26, 2017)

Before WILLIAM PRYOR, and ROSENBAUM, Circuit Judges, and UNGARO,[*] District Judge.

WILLIAM PRYOR, Circuit Judge:

This appeal requires that we decide whether a police officer who threw a diversionary device, known colloquially as a "flashbang," into a dark room occupied by two sleeping individuals, without first visually inspecting the room, is entitled to qualified immunity against a complaint of excessive force, 42 U.S.C. § 1983, and to official immunity against a complaint of assault and battery. At dawn, officers of the Clayton County, Georgia, Narcotics Unit executed a search warrant for Jason Ward's apartment. Ward and his girlfriend, Treneshia Dukes, were asleep in his bedroom. After an officer detonated a flashbang outside the apartment and another officer broke the glass in a window to the bedroom, Officer Nicholas Deaton threw a flashbang into the bedroom. The flashbang exploded near Dukes, who suffered serious burns. Dukes filed a complaint against Deaton and Deaton's supervisor, Commander Stephen Branham, for excessive force, assault, and battery. The district court granted the officers summary judgment on the grounds that they are immune from suit. Although we agree with Dukes that Deaton used excessive force, we also agree with the district court that Deaton is entitled to qualified immunity because it was not clearly established that his

_____

[*]Honorable Ursula Ungaro, United States District Judge for the Southern District of Florida, sitting by designation.

conduct violated the Constitution. And he is entitled to official immunity because Dukes offers no proof that Deaton intended to injure Dukes. Deaton's supervisor, Branham, also enjoys qualified immunity from the complaint against his subordinate. We affirm.

## I.    BACKGROUND

On July 19, 2010, a special agent with the Narcotics Unit of Clayton County, Georgia, obtained a warrant to search Jason Ward's apartment. The application for the warrant stated that a confidential informant had observed a "small quantity of a green leafy substance suspected to be marijuana" in the possession of Ward. The application also stated that Ward had several arrests for possession of marijuana, sold narcotics from his apartment, and was known to carry a silver nine-millimeter handgun. The application sought a "no-knock" provision because "drug dealers commonly utilize weapons, dogs, and barricades to hinder law enforcement in the execution of their duties." A magistrate judge approved the no-knock provision.

Ward resided in a two-bedroom apartment on the first floor of an apartment complex. The front door to the apartment lay halfway down a short hallway. A window in Ward's bedroom faced an outdoor courtyard. Adjacent to Ward's bedroom, a living room with sliding glass doors opened onto a small balcony overlooking the courtyard.

To execute the search warrant, Stephen Branham, the commander of the county SWAT team, prepared an operational plan with four teams: Alpha, Bravo, Charlie, and Delta. Alpha was the "entry team." Its job was to breach the main door to Ward's apartment and secure the persons inside. Bravo was the support team. Its job was to wait outside and enter the apartment through the sliding glass door if help was needed. Deaton was a member of Bravo team. Charlie was a diversion team. Its job was to divert Ward's attention by performing a "break and rake" on his bedroom window. A break and rake is a tactic in which an officer breaks and clears out all of the glass in a window. This tactic is used to cover a room until the rest of the officers make entry. It is also used as a diversionary tactic. Delta team, composed of only Officer Suzanne Bennett, was also a diversion team. Bennett's job was to deploy a "bang-pole," a stick with a flashbang on the end of it, on the outside wall of the apartment.

The flashbang manual used by the county SWAT team explains that police use flashbangs in "high-risk warrant service" to "minimize the risk to all parties through the temporary distraction or disorientation of potentially violent or dangerous subjects." The manual classifies flashbangs as explosives that can generate heat in "excess of 2,000 degrees centigrade," a flash of light up to 80 times brighter than the flashbulb of a camera, and over 150 decibels of noise for less than one half of a second. Because flashbangs have the potential to cause

4

"serious bodily injury," Deaton and Branham testified that they received official instruction to visually inspect an area first before deploying a flashbang. The operational plan contemplated the use of two flashbangs—one thrown by Officer Scott Malette through the front door, the other deployed by Officer Bennett with the bang-pole. But the plan vested all SWAT team members with the authority to use more flashbangs if needed.

At 5:00 a.m. on July 21, the SWAT team members met to review the operational plan. Half an hour later, the SWAT team executed the warrant. Ward and his girlfriend, Treneshia Dukes, were asleep in the bedroom of Ward's apartment. Ward was awakened by a "boom" and then heard his "window break and shattering." Next, he remembered "Treneshia screaming," telling "her to get down," then grabbing the "pistol up under my head – up under my pillow," and "kicking into the hallway." Ward never discharged his gun. Dukes heard a "boom, and then [heard] the window like rattling and shattering . . . , and like as I'm waking up I just seen an object coming towards me." Dukes did not see who threw the object because she "was asleep." After the object hit her and exploded, Dukes ran into the bathroom where she was detained by the police.

The SWAT team detonated three flashbangs during the search. Bennett and Mallette deployed their flashbangs as the operational plan prescribed. Deaton

deployed the third flashbang. He was the only officer outside the window with a flashbang and testified that he threw his flashbang outside the window.

Although Deaton argues that his flashbang detonated outside the apartment, we construe the facts and draw all inferences from the evidence in the light most favorable to the non-movant, Dukes. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). Viewed in that light, Deaton threw the flashbang through the bedroom window where it landed near Dukes. Dukes testified that an object came through the window; that she was under a comforter; that the object landed on her right thigh; that the object "flashed" and "exploded"; that the explosion "blinded" her; and that the sound from the object "discombobulated" her, causing her run "into the [bedroom] wall." Several witnesses who saw the bedroom after the search testified that the walls were covered in black residue consistent with an explosion. For example, Andrea Ward, who was asleep in the second bedroom of the apartment the morning of the raid, testified that "the bedroom looked like it had been on fire, the window was busted out. The room was a mess and there was a black something, smoke and stuff on the walls, black smoke was on the walls in the hallway also."

Dukes suffered severe burns across both thighs and her right arm that Deaton testified were consistent with the detonation of a flashbang. She was

6

admitted to the hospital for three days after the raid. Ward was arrested and later convicted of being a felon in possession of a firearm.

Dukes filed a complaint against Officer Deaton and Commander Branham in the district court. The complaint alleged a violation of Dukes's right to be free from excessive force under the Fourth Amendment, 42 U.S.C § 1983, and state law claims of assault and battery against Deaton. She alleged a claim of supervisory liability against Branham.

After the close of discovery, Branham and Deaton moved for, and the district court granted, summary judgment. The district court inferred in Dukes's favor that Deaton threw a flashbang that landed on Dukes, but concluded that Deaton was entitled to qualified immunity against the claim of excessive force, official immunity against the claims of assault and battery, and that Branham was entitled to qualified immunity against the claim of supervisory liability.

## II.    STANDARD OF REVIEW

We review *de novo* whether the officers are entitled to immunity. *Hoyt v. Cooks*, 672 F.3d 972, 981 (11th Cir. 2012) (official immunity); *Townsend v. Jefferson Cty.*, 601 F.3d 1152, 1157 (11th Cir. 2010) (qualified immunity). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In an appeal of a denial of summary judgment based on qualified

7

immunity, '[a]ll evidence must be viewed in the light most favorable to the nonmoving party.'" *Townsend*, 601 F.3d at 1157 (alteration in original) (quoting *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1332 (11th Cir. 2004)).

## III.    DISCUSSION

Dukes challenges the grants of immunity to both Deaton and Branham. Dukes argues that the district court erred when it granted Deaton qualified immunity against her claim of excessive force, when it granted Deaton official immunity against her claims of assault and battery, and when it granted Branham qualified immunity against her claim of supervisory liability. These arguments fail.

Both officers are entitled to immunity. Although we conclude that Deaton's conduct violated the Fourth Amendment, qualified immunity protects him from suit because his violation was not clearly established in law when he acted. And official immunity protects Deaton from Dukes's complaint of assault and battery because she offers no evidence that he threw the flashbang with the intent to injure her. Qualified immunity also protects Branham because his subordinate's constitutional violation was not clearly established.

### A.  Deaton is Entitled to Qualified Immunity.

"Qualified immunity protects . . . officers from liability in [section] 1983 actions as long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lewis v.*

8

*City of West Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). The officer bears the initial burden to prove that he acted within his discretionary authority, *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir. 2002), which neither party disputes in this appeal. With discretionary authority established, the burden shifts to Dukes to prove that Deaton is not entitled to qualified immunity. *Id.*

To determine whether an officer is not entitled to qualified immunity at summary judgment, we employ a two-part inquiry. First, we ask "whether the facts, [t]aken in the light most favorable to the party asserting the injury, . . . show [that] the officer's conduct violated a [federal] right." *Salvato v. Miley*, 790 F.3d 1286, 1292 (11th Cir. 2015) (first and third alterations in original) (quoting *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014)). Second, we ask "whether the right in question was 'clearly established' at the time of the violation." *Id.* (quoting *Tolan*, 134 S. Ct. at 1866). When we perform this analysis, we "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 134 S. Ct. at 1866. Our function at summary judgment is to "determine whether there is a genuine issue for trial," not to weigh the evidence. *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

As a threshold matter, Dukes argues that the record supports a factual inference that Deaton intentionally threw the flashbang at Dukes, but we disagree.

9

In support of her argument, Dukes cites the testimony of Deaton and Branham that their training requires a visual inspection of an area before they deploy a flashbang into that area. This testimony does not warrant the inference that Deaton looked into the bedroom, saw Dukes, and threw the flashbang toward her. Dukes's argument would require us to infer that Deaton followed his training in one way by looking into the room, but ignored his training in another way by purposefully harming a bystander, Dukes. Although we must draw all inferences in favor of the non-movant at summary judgment, those inferences must be plausible. *Mize*, 93 F.3d at 742–43. The record does not support a reasonable inference that Deaton intentionally threw the flashbang at Dukes.

### 1.    Deaton Violated the Fourth Amendment.

Dukes argues, and we agree, that Deaton's deployment of the flashbang constituted excessive force in violation of the Fourth Amendment. Official action constitutes excessive force when it is objectively unreasonable. *Salvato*, 790 F.3d at 1293. To measure the objective reasonableness of official action, we weigh "the quantum of force employed" against "the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Id.* (citation omitted). But we do not apply these factors mechanically. *Id.* Whether an officer's actions are "objectively reasonable" is a function of "the facts and

10

circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (citation omitted).

The facts construed in the light most favorable to Dukes establish that Deaton used excessive force. Deaton's conduct posed a significant risk of harm. He threw a flashbang that can generate heat in excess of 2,000 degrees Celsius into a dark room in which the occupants were asleep. He also failed to inspect the room, as he was trained to do, to determine whether bystanders, such as Dukes, occupied the room or if other hazards existed. And there existed minimal need for Deaton's use of force. True, the warrant stated that an informant advised law enforcement that Ward kept a handgun on his person, and the applying officer attested that drug dealers are known to be violent. Perhaps this record could have supported the use of the two flashbangs contemplated by the operational plan to disorient the occupants of the apartment. We need not decide that question. Even if the record supports the use of the first two flashbangs, these earlier flashbangs made Deaton's deployment gratuitous. The break and rake and the detonation of the flashbang on the exterior wall diverted the attention of Ward and Dukes before Deaton deployed his flashbang. There is no evidence that Deaton was aware that Ward had drawn his gun or that Dukes or Ward resisted the officers. And the suspected crime that prompted the search was possession and sale of marijuana. Deaton deployed a dangerous device into a dark room for a de minimis return.

11

The decisions of our sister circuits support our conclusion that Deaton's conduct was unconstitutional. Our sister circuits have held that an officer's failure to perform a visual inspection before throwing a flashbang into an area weighs against reasonableness. *Estate of Escobedo v. Bender*, 600 F.3d 770, 785 (7th Cir. 2010); *Boyd v. Benton Cty.*, 374 F.3d 773, 779 (9th Cir. 2004). And they have held that the use of a flashbang in an area occupied by bystanders, like Dukes, similarly weighs against reasonableness. *Bender*, 600 F.3d at 786; *Boyd*, 374 F.3d at 779; *cf. Krause v. Jones*, 765 F.3d 675, 679 (6th Cir. 2014); *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 973 (7th Cir. 2003). The totality of the circumstances establishes that Deaton violated the Fourth Amendment.

### 2.    Deaton's Violation Was Not Clearly Established.

To overcome qualified immunity, Dukes also must prove that Deaton "violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 735 (2011)). Official conduct violates clearly established law if the "contours of [a] right [are] sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Al-Kidd*, 563 U.S. at 741 (alterations in original) (internal quotation marks omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Because no precedent of the Supreme Court, our Circuit, or the Supreme Court of

12

Georgia has addressed the constitutionality of flashbangs, Dukes must establish that "a general constitutional rule already identified in the decisional law . . . appl[ies] with obvious clarity" to Deaton's conduct. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (citations omitted).

To satisfy this narrow exception, official conduct must be so egregious that "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law." *Coffin v. Brandau*, 642 F.3d 999, 1015 (11th Cir. 2011) (en banc) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002)). When this exception for obvious clarity is "properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Al-Kidd*, 563 U.S. at 743 (internal quotation marks omitted) (citations omitted). It allows an officer to make "reasonable mistakes" about the law. *Saucier v. Katz*, 533 U.S. 194, 205 (2001).

We conclude that it was not clearly established that Deaton's conduct was unconstitutional when he acted. Although we recognize that the doctrine of excessive force makes some official conduct off limits even in "novel factual circumstances," *Pelzer*, 536 U.S. at 741, Deaton's conduct was not so lacking in justification that every reasonable officer would know that what he did constituted excessive force. The operational plan contemplated the use of flashbangs to disorient the residents, and there is no evidence Deaton intended to use his

13

flashbang for any other purpose. And the application in support of the search warrant stated that "drug dealers," such as Ward, "commonly utilize weapons, dogs, and barricades to hinder law enforcement in the execution of their duties." The application also stated that an informant had advised law enforcement that Ward carried a handgun "on his person." To be sure, Deaton should have followed his training and checked the bedroom before he threw. But a reasonable officer could have found it "difficult . . . to determine how the relevant legal doctrine, here excessive force," would apply. *Katz*, 533 U.S. at 205.

Dukes argues that "*no* decisional law is necessary to inform a reasonable officer that he should not blindly throw a [flashbang] grenade into the bedroom of a small apartment, at 5:30 a.m., . . . occupied[] by people who . . . were doing nothing other than sleeping," but this portrait ignores facts stated in the warrant and the purpose of a flashbang. Ward carried a weapon. The warrant stated that drug trafficking occurred in his apartment. A flashbang is meant to disorient and avoid physical harm. And the operational plan permitted the officers to use a flashbang if needed. In the absence of binding caselaw to the contrary, Deaton, though badly mistaken, could have reasonably believed, based on the facts known to the officers on the morning of the search, that throwing a flashbang into Ward's bedroom was not excessive force.

14

Our conclusion that Deaton violated the Fourth Amendment, but that the contours of the right were not clearly established, also finds support in the decisions of our sister circuits. In *Boyd*, for example, the Ninth Circuit ruled that the detonation of a flashbang in a room with up to eight bystanders without first looking was unconstitutional, but that the right was not clearly established. 374 F.3d at 783–84. In *Bing ex rel. Bing v. City of Whitehall*, the Sixth Circuit also decided that the use of a second flashbang violated the Fourth Amendment, but that the violation was not obvious. 456 F.3d 555, 571 (6th Cir. 2006). Consistent with these decisions, we affirm the ruling that Deaton is entitled to qualified immunity.

## B. Deaton is Entitled to Official Immunity.

With two exceptions, the Constitution of Georgia protects public officials from personal liability for actions performed in their official capacity. Ga. Const. Art. I, § II, para. IX. Official immunity does not apply to ministerial acts performed negligently or discretionary acts performed "with actual malice or with intent to cause injury." *Murphy v. Bajjani*, 647 S.E.2d 54, 60 (Ga. 2007) (citation omitted). Dukes raises issues about both exceptions.

Dukes argues that the district court erred when it granted Deaton official immunity against her tort claims. Dukes argues that Deaton negligently performed a ministerial act when he deployed the flashbang, or, in the alternative, that the

15

deployment of a flashbang was a discretionary act that Deaton performed with actual malice. Both arguments fail.

Settled Georgia caselaw delineates between ministerial and discretionary acts. "A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." *Id.* at 57 (citation omitted). By contrast, "A discretionary act . . . calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Id.* (citation omitted).

Deaton's use of a flashbang was discretionary. It called for the "exercise of personal deliberation" because an officer must "examin[e] the facts" and "act[] on [those facts] in a way not specifically directed." *Bajjani*, 647 S.E.2d at 57 (citation omitted). The operational plan contemplated the specific use of two flashbangs, but vested every team member with the authority to use flashbangs. The search of Ward's apartment called for the kind of "split-second decision[s]" the Supreme Court of Georgia has held are discretionary. *E.g.*, *Cameron v. Lang*, 549 S.E.2d 341, 344 (2001) (holding that a high-speed police chase was discretionary).

Dukes's argument that we should evaluate the relevant conduct more narrowly fails. She argues that we should examine Deaton's failure to perform a visual inspection of the bedroom. Dukes argues that Deaton's training to inspect an

16

area before deploying a flashbang, makes this conduct ministerial. But her argument runs counter to Georgia law. In *Phillip v. Hanse*, for example, the Supreme Court of Georgia held that a decision of a police officer to engage in a high-speed chase, not his several violations of a police manual, was the relevant conduct for the purpose of official immunity. 637 S.E.2d 11, 12 (Ga. 2006). And the Supreme Court of Georgia held that the decision to engage in a high-speed chase is discretionary. *Id.* Like *Hanse*, Deaton's decision to deploy a flashbang was discretionary despite the violation of his training.

Deaton is entitled to official immunity under Georgia law. An officer is entitled to official immunity for discretionary acts performed in his official capacity unless he acted with actual malice or intent to injure. *Bajjani*, 647 S.E.2d at 60. Actual malice means "a deliberate intention to do wrong, and does not include implied malice, i.e., the reckless disregard for the rights or safety of others. . . . A deliberate intention to do wrong . . . must be the intent to cause the harm suffered by the plaintiffs." *Id.* (citations omitted). Although Dukes asks us to infer that Deaton acted with actual malice, no evidence in the record suggests that Deaton "inten[ded] to cause the harm suffered by" Dukes. *Id.* She cites Deaton's training to inspect an area and argues that he likely knew people were in the room, but these facts, at most, establish recklessness. We agree with the district court that Deaton is entitled to official immunity under Georgia law.

17

### C. Branham is Entitled to Qualified Immunity.

Dukes makes two arguments that Branham is liable for Deaton's conduct under a theory of supervisory liability: that Branham failed to train his officers in the proper use of flashbangs or, in the alternative, that Branham personally participated in the deployment of the flashbang. The first argument fails, and Dukes failed to preserve the second argument.

Dukes argues that Branham failed to train his subordinate officers in the use of flashbangs and that this failure exposes him to supervisory liability for Deaton's violation of the Fourth Amendment, but we disagree. A supervisor cannot be liable for the constitutional violation of his subordinate if the constitutional violation was not then clearly established. *See Keating v. City of Miami*, 598 F.3d 753, 763 (11th Cir. 2010) (explaining that supervising officers are only liable under section 1983 if subordinate officers violated clearly established law); *Harper v. Lawrence Cty.*, 592 F.3d 1227, 1235–36 (11th Cir. 2010) ("[W]e must analyze whether Plaintiff properly stated a violation of [constitutional rights] against [the supervisor], and whether those rights were clearly established."). Branham is entitled to qualified immunity because Deaton's conduct was not a clearly established violation of the Fourth Amendment.

The district court ruled, and we agree, that Dukes offered her alternative argument too late in an improper attempt to amend her complaint. "A plaintiff may

18

not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (citation omitted). "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)." *Id.* In her amended complaint, Dukes alleged one theory of supervisory liability: Branham's failure to train his officers in the proper use of flashbangs. Although the amended complaint alleged that Branham gave Deaton "unbridled discretion to deploy [flashbangs]," nowhere did the complaint allege that Branham deployed the flashbang. But in her brief in opposition to Branham's and Deaton's motions for summary judgment Dukes asserted an alternative theory of supervisory liability that "Branham personally participated in the alleged unconstitutional conduct by Branham, himself, throwing a flashbang on to Ms. Dukes." Personal participation is a distinct ground for supervisory liability, *cf. Cottone v. Jenne*, 326 F.3d 1352, 1360–61 (11th Cir. 2003) (articulating the alternative theories of supervisory liability), which makes the assertion of it in a brief in opposition to summary judgment improper. *Gilmour*, 382 F.3d at 1315. As a result, we agree with the district court that Branham is entitled to qualified immunity.

## IV.    CONCLUSION

We **AFFIRM** the summary judgment in favor of Deaton and Branham.