[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14245

_____

D.C. Docket No. 2:17-cv-00174-KOB

TRINELL KING,

Plaintiff - Appellant,

versus

RICKY PRIDMORE,
COREY ARCHER,
ANDREW HILL,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(June 5, 2020)

Before ED CARNES and ROSENBAUM, Circuit Judges, and VINSON,* District
Judge.

_____

* Honorable C. Roger Vinson, United States District Judge for the Northern District of
Florida, sitting by designation.

VINSON, District Judge:

On September 28, 2015, Trinell King was reluctantly helping the police apprehend a fugitive in Warrior, Alabama. The operation ended in a shootout in which the fugitive was shot thirteen times and King was shot several times and seriously injured. King brought this civil rights action against three of the police officers involved, Ricky Pridmore, Andrew Hill, and Corey Archer (collectively, the officers).[1] As the case was winnowed down, King alleged a § 1983 claim for involuntary servitude under the Thirteenth Amendment to the U.S. Constitution and a violation of substantive due process under the Fourteenth Amendment. He also alleged claims for negligence, wantonness, failure to train/supervise, and false imprisonment under Alabama state law. In two separate orders, the District Court granted summary judgment for the officers on the constitutional claims (based on qualified immunity) and on the state law claims (based on state agent immunity). King appeals both rulings. After full review, and with the benefit of oral argument, we affirm.

I.

---

[1] King also sued the City of Warrior, its Chief of Police, and two additional officers as well, but he voluntarily dismissed those parties, leaving Pridmore, Hill, and Archer as the only defendants. Although we will collectively refer to them as "officers," we note that Pridmore, Hill, and Archer held different ranks at the time (officer, detective, and lieutenant, respectively).

"We review a grant of summary judgment *de novo* and apply the same legal standards that governed the district court's decision." *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1288 n.7 (11th Cir. 2019) (citing *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1293 (11th Cir. 2013)). Summary judgment is properly granted only "'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). In considering a motion for summary judgment, the non-movant's evidence must be accepted as true and all reasonable inferences must be drawn in his favor. *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018); *see also Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1315 (11th Cir. 2007).

## II.

The following facts come almost entirely from King's deposition testimony, so for purposes of our review we must (and do) accept these facts as true and draw all reasonable inferences in his favor.

In the morning hours of September 28, 2015, King drove his girlfriend's Chevrolet Monte Carlo from Birmingham to nearby Warrior to give Donavan Brown a ride. King and Brown were both convicted felons at the time, and King was on a form of state probation known as Treatment Alternatives for Safer Communities (TASC), which was part of the Jefferson County Community

3

Corrections Program (JCCCP).  In giving Brown a ride that morning, King knew that he was breaking the law in several ways.  Specifically, it is undisputed that he knew: (1) the car didn't have a license plate; (2) he didn't have (and, in fact, had never had) a driver's license; (3) he was driving without proof of insurance; and (4) being in the presence of a convicted felon violated his TASC and "the people at JCCCP wouldn't have liked that at all."[2]

At approximately 9:45 that morning, Officer Pridmore, who was driving a police SUV with a K-9, stopped the Monte Carlo because it did not have a license plate.  During the stop, Officer Pridmore asked King for his name and social security number, and King responded truthfully and produced a valid ID (albeit not a driver's license).  However, when Officer Pridmore asked Brown the same questions, Brown gave false information.  Officer Pridmore then went to his SUV to run their names in his database.  Shortly thereafter, he returned to the Monte Carlo and told Brown to be honest with him and provide his real name.  King encouraged Brown to do the same, telling him "yeah, just be one hundred with

_____

[2] King claims in his appellate brief that he and Brown were "not good friends" and that he was only giving Brown a ride because Brown's girlfriend had asked him to.  However, King testified that he and Brown grew up together, had attended the same school, socialized together, and had known each other for approximately 20 years.  King also said that he considered Brown his friend and "homeboy" and that he had given him rides before.  In any event, whether King and Brown had known each other for 20 years (as he testified) or were not good friends (as his brief claims) is irrelevant to the outcome of this case.  Regardless of how their relationship is characterized, it is undisputed that King knew Brown well enough to know that Brown, like himself, was a convicted felon.

him.  That mean be honest."  Officer Pridmore again asked Brown for his name and social security number, but Brown again gave false information.  When Officer Pridmore went back to his vehicle a second time, King asked Brown why he was lying, in response to which Brown told him that he had outstanding warrants and that he was carrying a gun.  Brown told King that he was going to try and make a run for it, and King said "Oh Lord," and began to shake his head.  At that point, Brown opened the passenger side door and ran into some nearby woods.  Officer Pridmore quickly pulled King from the car, handcuffed him, and put him in the backseat of his SUV.  As he was doing so, King told Officer Pridmore that Brown had a gun.  Officer Pridmore radioed for back-up and gave chase with his K-9.

Notably, King testified that up to this point in time, Officer Pridmore hadn't done anything that King felt was wrong; in fact, he said that the officer "did what he was supposed to do."  At some point, a tow truck was called to the scene and the Monte Carlo was hoisted onto the truck, but it wasn't driven away.

A number of police officers reported to the scene (Hill and Archer among them) to help search the woods and surrounding area, which included a residential neighborhood.  As they were conducting their search, several people stopped by to report that Brown had been seen in the neighborhood.  King conceded at deposition that it was (obviously) a dangerous situation for Brown, while armed

5

with a gun, to be running around and hiding from the police in a residential neighborhood.

At various points during the search, the officers asked King questions about Brown. King (who had already voluntarily told the officers about the gun), gave them Brown's real name, told them about his outstanding warrants, and provided them with his cell phone number.[3] King testified that he was willing to help the officers—and in the process he hoped to help himself—because he knew that he had violated the law and was at risk of being put back in jail, and he was worried that his girlfriend's car was going to be towed.

After looking for Brown for about an hour without success, the officers got tired and frustrated. They once again approached King—who was still handcuffed in the backseat of Officer Pridmore's SUV—and tried to get him to do more to help with their search. King testified as follows (emphasis added):

> A: . . . So when they got tired, they came back with me, like, f**k him, *you don't want to help us out, we're going to throw—we're going to hit you with this charge, you gonna start f**king us over, we'll f**k over you. I don't know where you get your car back.* You have to cooperate and help us catch him.
>
> Q: Did they tell you what charges that they were going to put on you, as you say?
>
> A: No.

_____

[3] The officers tried to call Brown on the cell phone number that King provided, but he wouldn't answer.

6

Q: They weren't specific about any charges?

A: No, because, I mean, first of all, I ain't got no—they still hadn't told me why I got pulled over.

Q: Well, you knew you didn't have that car tag; right?

A: Yes. . . . Okay.  The lieutenant [Archer] . . . was doing all the talking, like *if you are not going to help us, we're going to get you with this, we're going to try to throw some charges on you; we're going to make sure we f\*\*k over you, if you f\*\*k over us.  I don't know where you get your car down,* you've got to cooperate with us.  Every now and then a car pulled up and spotted him close.  I guess they was trying to give me time to see what I was going to do.  So I guess they got tired of it.  I got tired of it.  I'm already nervous, I'm already fixing to miss out on [a] job.  I need to go to TASC.  So I'm like, man, can ya'll just stop doing this and get me wherever ya'll got to do and let me go because I didn't do nothing wrong.

Eventually, the officers devised a ruse to try and get Brown.  The plan was simple and straightforward: King would tell Brown over the phone that the police had let him go and offer to pick Brown up wherever he was hiding, at which point the officers—who were supposed to be following at a distance—would converge on the scene and arrest him.  King told the officers that he did not want to participate in this ruse, but he contends that he was forced into it and agreed to go along only because he was "nervous and scared."  Specifically, he testified that:

A: With the negotiation, the threats, everything they was telling me, if I don't cooperate they're going to throw some charges on me and they going to f\*\*k over me.  So in the streets that means it could mean anything.  It can

7

mean being shot.  It can mean being anything.  My life—
I was nervous and scared.  So I ain't never—

Q: What do you mean in the streets that means?

A: Like what that mean, don't f**k over me, I'm going to
f**k over you.  That mean like if you cross over them,
then they're going to deal with you in a bad way, like get
shot or killed, anything.  So that's how I felt.  That's how
I was feeling and they left me no choice.

Although King testified at deposition that he was concerned the officers might tow his girlfriend's car and file criminal charges against him—and those were factors in his decision—he claims the threat of physical violence is what ultimately overcame his will and forced him to participate in the ruse.  His attorney conceded the point at oral argument, and King made it clear in a post-deposition affidavit, where he averred that (emphasis added):

> *The Defendants' threats of violence against me forced me to pick up Brown.  I was repeatedly asked in my deposition whether I was worried about my girlfriend's car being towed, worried about being charged with traffic offenses, and worried that I had violated [probation].  I testified that I was worried about these things and I did not want these things to happen.  This is true.  I was also concerned about Defendants making false charges against me, or planting drugs or a gun on me.  However, . . . [t]he main reason I picked up Brown is that the Defendants were going to hurt me if I refused.  I was ready to go to jail, to have the car towed, pay any traffic offenses, and fight false charges if the Defendants had not threatened to hurt me.*

8

To be clear, the alleged threats of physical violence against King consisted entirely of the officers telling him "[if] you gonna start f\*\*king us over, we'll f\*\*k over you." That was the only language they used that King perceived to be a threat of violence.[4]

At or around the time that King (very reluctantly) agreed to participate in the ruse, Brown called King's cell phone. Because he was in handcuffs, one of the officers told everyone to be quiet, answered the phone, and put it on speaker so that King could play his part. As they had discussed, King told Brown that the police had let him go and he offered to pick him up, and Brown replied that he was hiding in the woods near a bridge right up the street. King's car was then taken down off the tow truck and the officers let him go retrieve Brown, which he did.

Shortly after King picked up Brown near the woods, the officers attempted to pull the Monte Carlo over. As King's car was slowing to a stop, Brown removed the gun from his pocket. When King saw the gun, he told Brown to get out of the car and run. Instead, Brown started shooting at the police through the passenger window. The police returned fire, which King readily concedes they had every right to do. Brown shot Officer Pridmore once, and the officers shot

---

[4] During his deposition, King was asked to provide all the details and to be as specific as possible about the officers' threats, and that is the only language he mentioned. He was asked several times if the officers had said anything else to him that was relevant to (or part of) his claims in this lawsuit, and he said "no."

Brown thirteen times.  King found himself caught in the crossfire and was shot five times.  Fortunately (and incredibly), all the parties survived—albeit with serious injuries.  This lawsuit followed.

III.

It is important to make clear at the outset what this case is and is not about. King does not challenge the initial traffic stop itself, and he does not allege that Officer Pridmore did anything wrong during the stop.  And, as just indicated, he also doesn't allege that any of the officers were wrong to return fire once Brown started firing at them.  Rather, this case centers on what happened between these two events: the ruse that the officers employed to get Brown.  Specifically, King contends that he was forced to participate under threats of false criminal charges and physical violence in violation of the Thirteenth and Fourteenth Amendments, and Alabama state law.  The District Court held that the officers were entitled to qualified immunity on the constitutional claims and state agent immunity on the state law claims.  We will consider and discuss both immunities in turn.

*A. Qualified Immunity*

Qualified immunity protects government officials who have been sued in their individual capacity "'unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice

10

that what the defendant official was doing would be clearly unlawful given the circumstances.'" *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013) (quoting *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002)). To be entitled to qualified immunity, the government official must first establish that he was acting within his discretionary authority at the time of the allegedly unlawful conduct. *Id.* Because it is undisputed that the officers in this case were performing discretionary governmental functions at the relevant time, the burden shifts to King to show (1) that the officers violated the constitutional rights at issue, and (2) that those rights were clearly established at the time of the alleged misconduct. *Id.* at 1281. "These two requirements may be analyzed in any order," *Paez v. Mulvey*, 915 F.3d 1276, 1284 (11th Cir. 2019), but it is "'often beneficial'" to analyze them sequentially. *Plumhoff v. Rickard*, 572 U.S. 765, 774, 134 S. Ct. 2012, 2020, 188 L. Ed. 2d 1056 (2014) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009)). On the facts of this specific case, we believe it is appropriate to analyze the two qualified immunity prongs in order because, as will be seen, a discussion of what the officers actually did (for purposes of the first step) informs our decision as to whether that underlying conduct violated clearly established law (at the second step).

(1) Was there a Violation of Constitutional Rights?

11

At the first step in the qualified immunity analysis, we consider whether the officers violated King's Thirteenth and Fourteenth Amendment rights.

The Thirteenth Amendment provides, in relevant part, that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. Amend. XIII, § 1. "While the immediate concern was with African slavery, the Amendment was not limited to that. It was a charter of universal civil freedom for all persons, of whatever race, color, or estate, under the flag. The words involuntary servitude have a 'larger meaning than slavery.'" *Bailey v. State of Alabama*, 219 U.S. 219, 240-41, 31 S. Ct. 145, 151, 55 L. Ed. 191 (1911). "Various forms of coercion may constitute a holding in involuntary servitude. The use, or threatened use, of physical force . . . is the most grotesque example of such coercion." *United States v. Warren*, 772 F.2d 827, 833-34 (11th Cir. 1985). Another example of involuntary servitude is when "the victim is forced to work for the defendant . . . by the use or threat of coercion through law or the legal process." *United States v. Kozminski*, 487 U.S. 931, 952, 108 S. Ct. 2751, 2765, 101 L. Ed. 2d 788 (1988). The temporal duration of the involuntary servitude need not be long; it "can be slight." *United States v. Pipkins*, 378 F.3d 1281, 1297 (11th Cir. 2004), *vacated on other grounds, but later reinstated*, 412 F.3d 1251 (11th Cir. 2005).

12

The Fourteenth Amendment provides, in relevant part, that "[n]o State shall …deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. Amend. XIV, § 1.  "The Supreme Court has interpreted this clause to provide two distinct guarantees: substantive due process and procedural due process."  *DeKalb Stone, Inc. v. Cty. of DeKalb, Ga.*, 106 F.3d 956, 959 (11th Cir. 1997) (citing *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S. Ct. 975, 983, 108 L. Ed. 2d 100 (1990)).  The right to substantive due process—the claimed right at issue in this case—protects individuals from arbitrary conduct by government officials that "shocks the conscience."  *See id.; see also Waddell v. Hendry Cty. Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003).  "The somewhat nebulous 'shocks the conscience' phrase has taken on different meanings in different cases, depending on a given case's factual setting."  *Nix v. Franklin Cty. Sch. Dist.*, 311 F.3d 1373, 1375 (11th Cir. 2002).  It has generated "[c]onfusion in jurisprudence that can be fairly described as untethered from the text of the Constitution," and, for that reason, "the Supreme Court has been 'reluctant to expand the concept of substantive due process.'"  *Echols v. Lawton,* 913 F.3d 1313, 1326 (11th Cir. 2019) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125, 112 S. Ct. 1061, 1068, 117 L. Ed. 2d 261 (1992)).  Thus, to prove a substantive due process violation, plaintiffs face a very "high bar."  *Maddox v. Stephens*, 727 F.3d 1109, 1119 (11th Cir. 2013); *see also Nix*, 311 F.3d at 1379 ("Substantive due process is a doctrine

13

that has been kept under tight reins, reserved for extraordinary circumstances.").

Indeed, "[e]ven intentional wrongs seldom violate the Due Process Clause, and 'only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Maddox*, 727 F.3d at 1119 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S. Ct. 1708, 1716, 140 L. Ed. 2d 1043 (1998)).

King contends that the officers forced him to "work" for them under threat of false criminal charges and physical violence. For our analysis, we will assume, *arguendo*, that it would indeed violate the Thirteenth and Fourteenth Amendments if the officers had made such threats. But that begs the question: is there evidence they actually did that?

As for the alleged false charges, King testified that the officers never told him they were going to charge him with any specific crime, let alone false crimes. The officers never said or implied, for example, that they would plant evidence on him and charge him with a drug or firearm offense (or any other false crime) if he didn't help them. According to King, the officers merely told him that they would "throw some charges on [him]" if he didn't agree to participate in their ruse. It is undisputed, however, that there were several different offenses that he could have been lawfully charged with—at least three motor vehicle violations and being in the presence of a convicted felon while on probation. It simply doesn't violate the Constitution for police officers searching for an armed fugitive running and hiding

14

in a residential neighborhood to tell his confederate who has himself violated the law that he could be charged unless he helps find him. The police lawfully use the same or similar tactics to encourage and incentivize people to assist law enforcement all the time. To be sure, confidential informants don't usually agree to help the police out of a sense of altruism or civic duty but, rather, because they are facing arrest and have been threatened with prosecution for their own criminal conduct. Thus, even taking King's testimony as true and drawing all reasonable inferences in his favor, there is no evidence that the officers threatened him with false charges. King is essentially asking us to speculate that when the officers said they were going to "throw some charges on [him]" that meant *false* charges. This we cannot do since there is no evidence to support it. *See, e.g., Chapman v. Am. Cyanamid Co.*, 861 F.2d 1515, 1518 (11th Cir. 1988) (explaining that although reasonable inferences must be drawn in favor of the non-movant on summary judgment, "an inference based on speculation and conjecture is not reasonable"); *see also Lee v. Celotex Corp.*, 764 F.2d 1489, 1491 (11th Cir. 1985) ("The allegation that plaintiff [relied on to avoid summary judgment] is not supported by reasonable inferences arising from the undisputed facts, but is based on speculation and conjecture that renders them mere guesses or possibilities.").[5]

---

[5] Although King conceded at deposition that the officers never threatened to charge him with any specific crime, he stated in his post-deposition affidavit that he was "concerned" they were going to plant drugs or a gun on him and charge him with a false crime. He argues in his

15

As for the alleged threats of physical violence, the evidence is similarly thin. If the officers had told King "help us, or we're going to f**k you up" (or something like that) then King would have a more compelling argument. But that isn't what he said they said. Instead, King testified that the officers told him "[if] you don't want to help us out, we're going to throw—we're going to hit you with this charge, you gonna start f**king us over, we'll f**k over you. I don't know where you get your car back." Thus, when the "if you f**k over us, we'll f**k over you" language is viewed *in the context that King himself provides*, it is clear the officers were warning him that if he did something that they perceived as bad to them first (i.e., not participate in the ruse), then they would respond in kind and do something bad to him, specifically by charging him and towing his girlfriend's car for an indefinite duration.

---

brief on appeal that this was a reasonable inference to draw because the officers had threatened him with "serious" charges, and the offenses that he committed weren't serious. We see at least three problems with this argument. First, there is no evidence in the record to support this argument. King never said at his deposition (or in his affidavit) that the officers threatened him with "serious" charges. He said only that they threatened to "throw *some* charges" on him. Second, even if the officers had threatened him with serious charges and the offenses that he committed wouldn't usually qualify, the consequences of his being charged with those minor offenses in this case—i.e., his girlfriend's car being towed and the possibility if not probability that his probation would be revoked and he would be sent back to prison—were things that most people (both civilians and law enforcement alike) would consider serious. Third and lastly, it bears noting that even if we accept that the officers threatened him with serious and false charges, King testified that he was willing to fight those charges in court. Thus, as earlier noted (and as his attorney acknowledged at oral argument), it wasn't the threat of false charges that he claims overcame his will and forced him to assist in the ruse. It was the alleged threat of physical violence, which we will discuss next in the text above.

16

In short, based on the facts as taken from King's own deposition testimony, the officers didn't violate the Thirteenth or Fourteenth Amendment. Nevertheless, as will be seen next, we don't have to (so we don't) hang our hat solely on that peg of the analysis.

### (2) Was the Law "Clearly Established"?

Assuming that King has shown a violation of the Thirteenth and Fourteenth Amendments, we next consider whether it was "clearly established" that what the officers did in this case violated his rights thereunder. In doing so, we must apply a "wholly objective" standard:

> The qualified immunity defense embodies an objective reasonableness standard, giving a government agent the benefit of the doubt, provided that the conduct was not so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed the acts. Because we have rejected the inquiry into an official's state of mind in favor of a wholly objective standard, the government actor's intent and motivation are insignificant in determining entitlement to qualified immunity. State officials can act lawfully even when motivated by a dislike or hostility if the record shows that they would have acted in the same way without such sentiments. . . . Whenever a public officer is sued for money damages in his individual capacity for violating federal law, the basic qualified immunity question looms unchanged: Could a reasonable officer have believed that what the defendant did might be lawful in the circumstances and in the light of the clearly established law?

17

*Crosby v. Paulk*, 187 F.3d 1339, 1344-45 (11th Cir. 1999) (citations, quotation marks, and brackets omitted).  Thus, "[f]or the law to be clearly established to the point that qualified immunity does not protect a government official, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances."  *Hudson v. Hall*, 231 F.3d 1289, 1294 (11th Cir. 2000) (citation and quotation marks omitted).  This "standard of objective reasonableness" provides protection to "'all but the plainly incompetent or those who knowingly violate the law.'"  *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 925 (11th Cir. 2000) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986)).

In undertaking this analysis, we are mindful that the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S. Ct. 2074, 2084, 179 L. Ed. 2d 1149 (2011) (citations omitted); *see also White v. Pauly*, — U.S. —, 137 S. Ct. 548, 551-52, 196 L. Ed. 2d 463 (2017) ("In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases ….Today, it is again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'  As this Court

18

explained decades ago, the clearly established law must be 'particularized' to the facts of the case.") (citations omitted).

For a right to be "clearly established," the contours of the right must be so clear that a reasonable official—again, judged by an objective standard—would know that he was violating that right.  *See Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019).  A plaintiff can show that the contours of the right at issue were clearly established in one of three ways:

> First, the plaintiffs may show that a materially similar
> case has already been decided.  Second, the plaintiffs can
> point to a broader, clearly established principle that
> should control the novel facts of the situation.  Finally,
> the conduct involved in the case may so obviously violate
> the constitution that prior case law is unnecessary.  Under
> controlling law, the plaintiffs must carry their burden by
> looking to the law as interpreted at the time by the United
> States Supreme Court, the Eleventh Circuit, or the
> [relevant State Supreme Court].

*Terrell v. Smith*, 668 F.3d 1244, 1255-56 (11th Cir. 2012) (citations, quotation marks, and brackets omitted); *id.* at 1256-58 (discussing the three methods in further detail); *see also Vinyard v. Wilson*, 311 F.3d 1340, 1350-53 (11th Cir. 2002) (same).

King agrees that there is no materially similar case on point, so the first method is out.  Consequently, the question is whether this case falls under the second or third methods to establish that the law at issue was clearly established.

19

The second and third methods are known as "obvious clarity" cases. *Gaines v. Wardynski*, 871 F.3d 1203, 1209 (11th Cir. 2017). "They exist where the words of the federal statute or constitutional provision at issue are so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful, or where the case law that does exist is so clear and broad (and not tied to particularized facts) that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id.* (citation, quotation marks, and footnote omitted). In *Dukes v. Deaton*, 852 F.3d 1035 (11th Cir. 2017), we conflated the two methods and referred to them together as a "narrow exception." *Id.* at 1043; *accord Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002) (same). Cases that fall under this narrow exception are rare and don't arise often. *Gaines*, 871 F.3d at 1209 (citing multiple cases); *see also, e.g., Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1280 n.10 (11th Cir. 2002).

In light of the rarity of obvious clarity cases, if a plaintiff cannot show that the law at issue was clearly established under the first (materially similar case on point) method, that usually means qualified immunity is appropriate. *Corbitt*, 929 F.3d at 1312 ("Notwithstanding the availability of [the obvious clarity exceptions], this Court has observed on several occasions that 'if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the

20

defendant.'") (citing *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009), in turn quoting *Priester*, 208 F.3d at 926)).

We have no difficulty concluding that this is not the sort of case that would justify applying the rare and narrow exception to requiring a plaintiff to identify a materially similar case on point. Again, sandwiched in between telling King that they were going to "throw some charges" on him if he didn't help with the ruse, and that they were going to tow his girlfriend's car and they didn't know when or how he would be able to get it back, the officers told him "[if] you gonna start f\*\*king us over, we'll f\*\*k over you." It cannot be maintained that all objectively reasonable officers in their position would have known—*with obvious clarity*—that what they said, in context, would necessarily be understood as a threat of false criminal charges and physical violence in violation of the Constitution. While King may have *subjectively* interpreted the officers' words to that effect, that is categorically not the standard that we must apply.[6]

In summary, even if the officers violated the Thirteenth and Fourteenth Amendments (and, as discussed earlier, we do not believe they did), those rights

---

[6] Even if King's subjective interpretation of what the officers said was reasonable from his point of view, a reasonable officer in their position could have seen it as mere enticement. Indeed, King himself testified that the officers' statement "could mean anything." If what they told King could mean "anything" to someone in his position, it obviously cannot be said that all reasonable officers in their position would have known it to mean an unconstitutional threat of false criminal charges and physical violence.

21

were not so clearly established that all objectively reasonable officers in their position would have known that what they said to King violated the Constitution's prohibition against involuntary servitude or its "nebulous" doctrine of substantive due process.

## B. State Agent Immunity

Alabama law provides state agents with "immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." Ala. Code § 6-5-338(a). As we recently noted in *Hunter v. Leeds, City of*, 941 F.3d 1265 (11th Cir. 2019), the restatement of state-agent immunity that the Alabama Supreme Court set forth in *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000), governs whether the officers are entitled to immunity under § 6-5-338(a). *Id.* at 1283 (citations omitted). The test laid out in *Cranman*, subsequently modified by *Hollis v. City of Brighton*, 950 So. 2d 300 (Ala. 2006), provides in relevant part as follows:

> A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's …exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a).

*Hunter,* 941 F.3d at 1283 (quoting *Ex parte City of Homewood*, 231 So. 3d 1082, 1087 (Ala. 2017) (quotation marks and citations omitted)).  In other words, law enforcement officers are generally immune from tort liability for conduct that falls within the scope of their discretionary law enforcement duties.  *Id.* (citing *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 741 (11th Cir. 2010)).  However, there are exceptions to this general rule.  Specifically, "a state agent is not entitled to state-agent immunity if (1) the U.S. Constitution, federal law, the state Constitution, or state laws, rules, or regulations enacted or promulgated for the purpose of regulating the activities of a governmental agency, require otherwise; or (2) the agent acts 'willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.'"  *Id.* (citations omitted).

The test for discretionary function and state-agent immunity follows the same burden-shifting analysis as the test for federal qualified immunity.  *Hunter*, 941 F.3d at 1283.  First, the officer asserting immunity has the burden to show that the plaintiff's claims arise from a function that would entitle the officer to immunity.  *Id*. (citations omitted).  The burden then shifts to the plaintiff to show that one of the two aforementioned exceptions applies.  *Id.*  Because the officers here were performing discretionary law enforcement functions at the relevant time, the burden shifts to King to show "either that they failed to discharge their duties in accordance with the law or that they acted willfully, maliciously, fraudulently, in

23

bad faith, beyond their authority, or under a mistaken interpretation of the law."
*Id.* at 1283-84.

This Court has observed several times that because the Alabama Supreme
Court has largely equated federal qualified immunity with state discretionary-
function immunity, "the same facts which establish an entitlement to qualified
immunity may also establish that the officers are entitled to discretionary-function
immunity." *Id.* at 1284; *accord id.* ("For the same reasons that Jackson, Reaves,
and Chalian are entitled to qualified immunity on Hunter's § 1983 claim, we find
that they are also entitled to discretionary-function immunity on Hunter's state-law
claims."); *see also, e.g., Sheth v. Webster,* 145 F.3d 1231, 1239-40 (11th Cir. 1998)
("Under both Alabama law and federal law, the core issue is whether a defendant
violated clearly established law . . . The same facts which establish Sergeant
Williams' entitlement to qualified immunity establish that his acts were not willful,
malicious or in bad faith.  The Alabama Supreme Court has equated qualified
immunity with discretionary function immunity.").

For the same reasons that the officers are entitled to qualified immunity on
King's § 1983 claims, we find that they are also entitled to discretionary-function
immunity on his state law claims.[7]

---

[7] We recognize, as was noted in *Sheth*, "that entitlement to qualified immunity under
federal law will [not] always entitle a defendant to discretionary function immunity."  145 F.3d
at 1240 n.8.  But we find that result justified on the facts of this case.  Because federal and state

24

## IV.

The decision by the District Court granting the officers qualified immunity on the federal claims and state agent immunity on the Alabama state law claims is **AFFIRMED**.

---

law do not "require otherwise," and because there is insufficient evidence that the officers acted "willfully, maliciously, fraudulently, in bad faith, beyond [their] authority, or under a mistaken interpretation of the law," we don't find it necessary to undertake a separate analysis.  The same reasons that entitle the officers to qualified immunity here entitle them to state agent immunity.

ROSENBAUM, Circuit Judge, concurring in the judgment:

I concur in the judgment. As for footnote 2, the point there is that it is "undisputed that King knew Brown well enough to know that Brown . . . was a convicted felon." *See* Op. at 4 n.2. In fact, King outright admitted knowing before the events at issue in this case that Brown was a convicted felon. ECF No. 65-3 at 23(87-88). That fact has never been in dispute. For that reason, I fail to see the purpose of the rest of footnote 2.